Reserve Knitting Mills, Inc. v. Commissioner.
Reserve Knitting Mills v. Commissioner
Docket Nos. 17055, 17351.
United States Tax Court
1949 Tax Ct. Memo LEXIS 210; 8 T.C.M. (CCH) 379; T.C.M. (RIA) 49093; April 25, 1949
*210 In the years 1942 to 1945, inclusive, petitioner paid compensation to its three officers under a minimum salary plus contingent bonus arrangement. Held, that the amounts paid by petitioner to its three officers in the years 1942 to 1945, inclusive, constituted reasonable compensation for the services actually rendered by them and that such amounts are deductible by petitioner as ordinary and necessary business expenses. Milton R. Schlesinger, Esq., Public Square Bldg., Cleveland, Ohio, for the petitioner. Clarence E. Price, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion These cases, consolidated for hearing and disposition by agreement of the parties, involve the following deficiencies: Declared
Excess
Income
Value Excess
Profits
Year
Taxes
Profits Taxes
Taxes
1942
$604.45
$2,206.87
$ 9,941.27
1943
91.43
5,406.82
40,618.77
1944
2,984.10
34,860.95
1945
750.29
25,745.32 Petitioner seeks a redetermination of approximately $105,000 of the above deficiencies. The sole question presented is whether amounts paid by the petitioner to its officers in 1942, 1943, 1944, and 1945 constituted *211 reasonable compensation for services actually rendered by them in those years and are deductible by the petitioner as ordinary and necessary business expenses. Findings of Fact The petitioner, Reserve Knitting Mills, Inc., is a corporation organized and existing under the laws of the State of Ohio and is and has been continuously since January, 1935, engaged in the business of producing ladies' wear. Petitioner kept its books and filed its Federal tax returns for the years in question on a calendar year and accrual basis with the collector of internal revenue for the 18th district of Ohio. From its incorporation to date, petitioner has been authorized to issue 250 shares of $100 par value common stock and no other stock. The stock ownership as of the date of original issue and during the years in question was as follows: Original
Issue
1942-1945
I. B. Weinberg, presi-
dent
124 shares
214 shares
Paul Cosley, vice-presi-
dent
1 share
25 shares
Lillian Weinberg, secre-
tary
1 share
11 shares
From 1935 until 1938, petitioner manufactured and sold "knitwear". It purchased yarn, wove it into material and then fashioned, cut, sewed, and finished *212 it into ladies' outer wear which it sold. In 1938 and 1939, the petitioner also engaged in the "sportswear" field which involved the large-scale production of popular priced ladies' wearing apparel. In 1941, petitioner ceased operating as a manufacturer and begain operating as a contractor, cutting, sewing, and finishing piece goods furnished to it by jobbers. The following minimum salary, plus contingent bonus arrangement, was adopted by the petitioner at a special meeting of its board of directors on January 2, 1942: "Upon motion made by Mr. I. B. Weinberg and seconded by Mr. Paul Cosley salaries for the year 1942 were set as follows: "I. B. Weinberg - $30,000.00 plus 25% of net profits (before Income Taxes) in excess of $15,000.00. Total salary for the year not to exceed $50,000.00. "Paul Cosley - $20,000.00 plus 17 1/2% of the net profits (before Income Taxes) in excess of $15,000.00. Total salary not to exceed $30,000.00 for the year. "Lillian Weinberg - $6,000.00 plus 7 1/2% of the net profits (before Income Taxes) in excess of $15,000.00. Total salary for the year not to exceed $10,000.00." This salary-bonus plan was retained by corporate resolutions passed in 1943, *213 1944, and 1945. Petitioner's capital was $25,000. From 1942 to 1945 when petitioner was operating as a contractor, minimum capital was required for machines, trimmings, buttons, and weekly payrolls. During this period, the firm was contracting exclusively for Majestic Specialities, Inc., one of the largest women's sportswear distributors in the country. Yardgoods were furnished by Majestic under a "memorandum bill", title remaining in Majestic. Reserve billed Majestic at the finished price of $34.50 a dozen for the Majestic jackets it produced, which price included the presumed cost of the material, labor costs, trimming, and Reserve's profit. The number of employees of the petitioner at the peak production period in each of the years 1935 to 1945, inclusive, were as follows: 1935
60 employees
1936
85 employees
1937
48 employees
1938
49 employees
1939
74 employees
1940
86 employees
1941
104 employees
1942
92 employees
1943
88 employees
1944
86 employees
1945
78 employees
The total compensation paid by petitioner to its officers, dividends paid, and its net income and surplus for the years 1935 to 1945, inclusive, were as follows: Compensation to Officers
Total
Divi-
Vice-
Com-
dends
Year
Net Sales
President
President
Secretary
pensation
Paid
1935
$123,974.88
$ 7,200.00
$ 4,200.00
$1,200.00
$12,600.00
None
1936
171,032.66
8,400.00
4,800.00
1,800.00
15,000.00
$4,200
1937
147,267.04
2,400.00
1,800.00
909.00
5,109.00
250
1938
88,554.37
3,700.00
2,525.00
756.50
6,981.50
250
1939
142,297.30
9,000.00
7,200.00
1,000.00
17,200.00
250
1940
99,932.54
1,990.57
1,994.00
1,155.24
5,140.01
None
1941
301,607.78
15,000.00
10,000.00
3,000.00
28,000.00
250
1942
619,234.27
30,000.00
20,000.00
6,000.00
56,000.00
250
1943
942,666.79
43,028.58
29,120.00
9,908.58
82,057.16
250
1944
963,222.44
40,151.71
27,106.20
9,045.51
76,303.42
250
1945
943,527.20
34,717.03
23,301.92
7,415.10
65,434.05
250
*214 Net
Income
Surplus
1935
$ 5,205.13 $ 4,477.30
1936
1,516.20 1,684.33
1937
198.04 1,616.53
1938
502.78 1,806.46
1939
2,586.96 3,767.39
1940
(1,240.10)
2,527.29
1941
3,579.22 5,106.51
1942
13,647.67 11,504.95
1943
41,057.18 19,812.13
1944
35,303.42 43,988.27
1945
24,434.05 58,280.58
In each of the years 1942, 1943, 1944, and 1945, the Commissioner allowed the petitioner a total deduction of $39,000 for compensation to its three officers. Salary allowances fixed in each year by the Commissioner were as follows: I. B. Weinberg
$20,000
Paul Cosley
15,000
Lillian Weinberg
4,000
$39,000
I. B. Weinberg has worked continuously in the ladies' outer wear industry from 1909 when he quit school at the age of 14. Starting as an errand boy and sweeper at $4 a week, he studied designing, pattern making, and pattern grading. He later became a stockroom boy, foreman of the sewing and cutting departments, a designer, and salesman. In 1931, I. B. Weinberg left his position as superintendent of Green-Haas-Schwartz Company to become general superintendent of and a minor stockholder in Excelsior Knitting *215 Mills. As general superintendent of Excelsior, he was in complete charge of the plant, bought the yarns, designed the fabrics, styled and designed the garments and had complete charge of production and costs. Following his resignation from Excelsior in 1934, that company sought to induce him to return as its executive and administrative head. Weinberg, however, declined this offer and shortly after he left, Excelsior, which had previously operated at a profit, shut down. Cosley commenced working in a grocery store for $3 a week when he was 13 years old. He later became manager of a grocery store and the owner of his own establishment. He sold this store at a profit and in 1923 started as a dispatcher of work for the Green-Haas-Schwartz Company. In 1924, he met I. B. Weinberg, who was then working for the same concern, and since that time has been Weinberg's right-hand man in various positions as assistant factory manager at Green-Haas-Schwartz, assistant factory manager at Excelsior, and in his present position as operations assistant at Reserve. When I. B. Weinberg left Excelsior in 1934 to organize the petitioner, Cosley was offered on various occasions the opportunity to replace *216 Weinberg as Excelsior's factory manager but declined those offers to become the vice-president and a director of Reserve. I. B. Weinberg was the executive head of petitioner and exercised control over finances, production costs, and its contact with customers. In addition to these responsibilities, he acted as a pattern maker, instructed the operators in sewing, remained on the floor with the employees preparing and supervising their work for smoother operation, and constantly checked production. Cosley as assistant manager, with the exception of the executive and financial duties, worked in close conjunction with Weinberg, directly supervising the production end of the business. Cosley's primary responsibility however was in the sewing department. Weinberg and Cosley spent most of their time either in the cutting or sewing rooms during shop hours. They arranged the work, shifted employees, routed material, and kept daily records of the production of these operations. Both men could perform any operation in the mill and during the war years personally trained many new employees. As petitioner paid its employees on a piece-work basis with a minimum guarantee, Weinberg and Cosley *217 personally checked the trouble when an operator's piece work on any day fell below her minimum guarantee. Weinberg and Cosley were also responsible for introducing several new production plans which resulted in increasing the efficiency of petitioner's business. Weinberg devised a method of removing from material the objectionable creases which form on both edges of the bolts. This system saved both time and material. A "piece work ticket" plan was introduced for recording the number of garments handled by a sewing room operator, which proved superior to the conventional "progressive ticket" plan ordinarily used in the trade. They also inaugurated a so-called "bundle method" for the routing of materials through the sewing rooms which materially reduced the number of employees, time consumed, and the number of "seconds" turned out under the "bin system" previously used. From the start of petitioner's business in 1935 to date, it has never suffered a strike or other labor difficulty. The operators in petitioner's plant operated on a piece-work basis with a guaranteed minimum hourly wage. If an operator was unable to earn by piece work the equivalent of the guaranteed minimum, petitioner *218 was obligated to make up the difference between the piece-work earnings and the hourly wage guaranteed. Petitioner paid considerably less in such makeup pay to its employees than did most comparable plants. The methods used by Weinberg and Cosley increased petitioner's productive efficiency and their activities in the plant made unnecessary the hiring of many additional employees. Other concerns during 1942 to 1945 attempted to make at a profit the "Majestic Jacket", the major item which petitioner produced for Majestic Specialties, but all failed. Majestic itself attempted to produce the jacket in 1947 and 1948, but in the fall of 1948 abandoned the project and again took petitioner's production. Weinberg regularly worked from seven in the morning until eight or nine at night. In addition, he worked every Saturday and most Sundays. For 39 years he took no vacation. Cosley's regular working hours were from 7:30 in the morning until six at night. He frequently worked in the evening and sometimes on Saturdays and Sundays and took no vacations during the period from 1942 to 1945. Lillian Weinberg, who is the sister of I. B. Weinberg, prior to her employment by petitioner in 1935 *219 was engaged in clerical, stenographic and secretarial work and had been employed as an office manager. Since the organization of petitioner in 1935, she has been its secretary, one of its directors, and its office manager. During the years 1942 to 1945, inclusive, she handled all incoming and outgoing correspondence, checks, and bills. She prepared daily summaries of the business and end-of-the-month statements of petitioner's obligations to and from Majestic Specialties. She checked remittance statements received from Majestic, received orders and made up the cutting tickets used in the cutting room to fill such orders. She handled the daily cutting production sheets, freight bills, insurance, payrolls, labor cost analyses, bank statements, and the various reports which petitioner was obliged to file with the Government. She did the bookkeeping for petitioner and each month computed trial balances. During the year 1942, she had a part-time assistant, in 1943 and 1944, a full-time assistant, and in 1945 one full-time and one part-time assistant. During the years involved, her regular hours were from 8:30 to 5:00 six days a week and she occasionally worked on Sundays. She took no *220 vacations from 1942 to 1945. During the early years of petitioner's existence, its three officers were paid on the basis of what the business could afford rather than what their services were actually worth. In 1934, Cosley received several offers from Excelsior Knitting Mills to act as its factory manager. He was offered $10,000 on one occasion and at another time was told to "make my own ticket". In 1943, I. B. Weinberg rejected an offer of a position as plant manager at the Stone Knitting Mills of Cleveland, Ohio, and the Winona Knitting Mills in Winona, Minnesota, either of which positions, on a salary and bonus basis, would have yielded him over $50,000 per year. The amounts paid by petitioner to its three officers in the years 1942 to 1945, inclusive, constituted reasonable compensation for the services rendered to petitioner by such officers in those years. Opinion ARUNDELL, Judge: The sole issue herein is whether the compensation paid by petitioner to its three officers during the years 1942 to 1945, inclusive, may be deducted by it as "a reasonable allowance for salaries or other compensation for personal services actually rendered" under section 23(a)(1)(A) of the Internal Revenue Code *221 . The determination of reasonableness rests upon the particular facts of each case and is a question on which petitioner bears the burden of proof. The record clearly shows the unusual qualifications of I. B. Weinberg and Cosley in the ladies-wear business, Weinberg having over 30 years' and Cosley approximately 20 years' experience in all phases of that industry. In operating petitioner's business, they were thoroughly familiar with and able to perform any of its various operations, in addition to their regular duties of management and administration. Lillian Weinberg as petitioner's office manager had performed similar work since 1924. In fact, respondent does not question the fact that these persons were capable in the performance of their duties, nor does he contend that the salaries paid by petitioner to its officers were in proportion to their stockholdings. A marked financial change took place in petitioner's business following its abandonment of so-called manufacturing operations in 1941 in favor of contracting. Net sales rose from approximately $300,000 in 1941 to $619,000 in 1942, and to well over $900,000 in 1943, 1944, and 1945. Petitioner's total net income after salaries *222 for the years 1942 to 1945, inclusive, was over four times as great as its capital. Its surplus increased from $5,106.51 at the close of the year 1940 to $58,280.58 at the close of the year 1945. All this was accomplished on a capital investment of $25,000 and with no appreciable increase in the number of employees. It is our opinion that the financial success of petitioner's business during these years was primarily due to the skill and industry of its officers. It was testified that the contracting business was a hazardous enterprise, the contractor being forced to produce, at a profit, garments at a price below that at which the purchaser could have manufactured them for itself. The evidence shows that other firms attempted to produce the so-called "Majestic Jacket" for Majestic Specialties, Inc., during the years 1942 to 1945, but none was successful. Later, in 1947 and 1948, Majestic Specialties discontinued taking petitioner's production and started the production of the Majestic Jacket in its own factory but found that it could not do the work as economically and cheaply as petitioner and thereafter renewed its contract with petitioner. We are convinced that Weinberg and *223 Cosley succeeded, where others had failed, because of their long experience in industry and their willingness personally to supervise every phase of petitioner's production. Both spent long hours at the plant, most of which time they spent checking on waste of time and material, and seeing that each operator earned on the piece-work basis more than the minimum salary guaranteed. They were able to effect substantial savings in the cost of materials and, by personally supervising production, eliminated the cost of hiring other skilled labor. It appears that because of their wide knowledge of the business and their day-to-day acquaintance with petitioner's business and its problems, they were also able to introduce innovations in its operating procedures which resulted in substantial savings to the petitioner in material and labor costs. Two witnesses, who were executives of large knitting mills, testified that the value of the services rendered by Weinberg and Cosley was whatever they made out of the business, as petitioner's profits were entirely due to their personal services. Another witness, who acted as a management consultant for a number of knitting mills, testified that the *224 officers were paid no more than their services were worth. Lillian Weinberg was also equally valuable to the petitioner in her phase of the business. Among other things, she personally handled all of its correspondence, kept its books and prepared regular reports for use in the business and for government purposes. It appears from the evidence that she did considerably more than would have ordinarily been expected of an office manager and at a considerable saving to the petitioner in the cost of running its office. The salary, plus bonus arrangement, introduced by petitioner in 1942 and under which the compensation in question was paid to its officers, recognized the fact that the success of the business was dependent primarily upon the ability of its officers and the effort they were willing to expend in its efficient management. The salaries paid to these officers during the period from 1935 to 1940 were based upon the petitioner's ability to pay rather than on the actual value of their services. During those years both I. B. Weinberg and Cosley could have secured better paying positions with other companies but preferred to remain with the petitioner in the hope that in later *225 years they would be paid salaries commensurate with their services. This consideration may properly be taken into account in determining the reasonableness of the compensation paid in the years before us. Upon the basis of all the facts of record, we conclude that the amounts paid by petitioner to its three officers in 1942, 1943, 1944, and 1945 constituted reasonable compensation for the services actually rendered by them and that such amounts were properly deductible as ordinary and necessary business expense. Decision will be entered under Rule 50.